Andrea L. Santarsiere
WY Bar No. 7-5396
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
Telephone: (303) 854-7748
asantarsiere@biologicaldiversity.org

*Attorney for Plaintiffs*

(additional counsel, pending admission
*pro hac vice,* listed on signature page)

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JAN 29  AM 9: 50

STEPHAN HARRIS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WESTERN WATERSHEDS PROJECT; and WILDEARTH GUARDIANS;<br><br>Plaintiffs,<br>vs.<br><br>USDA APHIS WILDLIFE SERVICES; JANET L. BUCKNALL, Deputy Administrator, USDA APHIS Wildlife Services;<br><br>Defendants. | Case No. 19-CV-20-F<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

### INTRODUCTION

1. The Center for Biological Diversity, Western Watersheds Project, and WildEarth Guardians bring this lawsuit against Defendants U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") Wildlife Services and Janet L. Bucknall, the program's Deputy Administrator (collectively "Wildlife Services"). Wildlife Services continues to kill predators and other wildlife without supplementing a decades-old environmental

analysis for its "Predator Damage Management" program in Wyoming. In so doing, Wildlife Services is violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347; the implementing Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500-1508; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2. NEPA requires supplemental analysis when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii). More than 20 years have passed since Wildlife Services analyzed the impacts of its Predator Damage Management program in Wyoming in finalized NEPA documents. New information and circumstances relevant to the predator-killing program, such as new scientific publications on the ineffectiveness of predator control, require that Wildlife Services prepare a supplemental NEPA analysis.

3. Through this complaint, Plaintiffs seek a declaration that Wildlife Services' ongoing authorization and implementation of the Predator Damage Management program in Wyoming violates federal law and is otherwise arbitrary and capricious. Plaintiffs additionally seek injunctive relief to redress the injuries caused by these violations of the law. Should Plaintiffs prevail, they will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). It has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the agency's violations of law occurred and continue to occur in this district,

2

and injury to Plaintiffs and their members occurred and continues to occur in this district. Moreover, plaintiff Western Watersheds Project maintains an office in this district.

## PARTIES

6. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit 501(c)(3) corporation with offices across the country, including in Tucson, Arizona; Oakland and Los Angeles, California; Denver, Colorado; Victor, Idaho; St. Petersburg, Florida; Portland, Oregon; and Washington, D.C. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center has more than 69,000 members throughout the United States and the world.

7. Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. Guardians has more than 223,000 members and supporters across the West, including those who reside in and visit the State of Wyoming. Guardians maintains offices in several states, including Denver, Colorado; Missoula, Montana; Portland, Oregon; and Santa Fe, New Mexico. Guardians has a long history of working to protect and restore native wildlife species across the West in general and Wyoming in particular, including gray wolves, mountain lions, black bears, grizzly bears, Canada lynx, coyotes, fishers, and wolverines. Guardians operates a wildlife program with campaigns focused on native carnivore protection and restoration, and on reining in the controversial, cruel, and destructive practices of Wildlife Services—including the use of poisoning, trapping, and aerial gunning.

8. The mission of Western Watersheds Project (WWP) is to protect and restore western watersheds and wildlife through education, public policy initiatives, and legal advocacy. Western Watersheds Project is a nonprofit environmental conservation group with 9,500

3

members and supporters. Founded in 1993, WWP has field offices in Idaho, Montana, Wyoming, Arizona, Utah, Nevada, Oregon, and California. WWP works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness.

9. Plaintiffs, as well as their members, staff, and supporters, are dedicated to ensuring that Wildlife Services complies with all applicable federal laws. Wildlife Services' Predator Damage Management program in Wyoming, along with its associated 1997 Environmental Assessment and Finding Of No Significant Impact for the Western District ("1997 EA/FONSI") and 1998 Environmental Assessment and Finding Of No Significant Impact for the Eastern District ("1998 EA/FONSI"), adversely impact Plaintiffs' interests in Wyoming's wildlife that could be killed by Wildlife Services—intentionally or unintentionally—including gray wolves, grizzly bears, black bears, coyotes, mountain lions, bobcats, foxes, raccoons, skunks, and others. Plaintiffs also have members who are adversely impacted by the threat that Wildlife Services poses to companion animals in Wyoming.

10. Plaintiffs' members live and recreate in or near areas in Wyoming where implementation of the Predator Damage Management program occurs, for the purposes of hiking, observing wildlife, and other recreational and professional pursuits. Plaintiffs' members enjoy observing, attempting to observe, photographing, and studying wildlife, including signs of those species' presence in these areas. The opportunity to possibly view wildlife or their signs in these areas is of significant interest and value to Plaintiffs' members, and it increases the use and enjoyment of public lands and ecosystems in Wyoming. Plaintiffs' members have engaged in

these activities in the past, and they intend to do so again soon.

11. Plaintiffs' members have a procedural interest in ensuring that Wildlife Services' activities comply with all applicable federal statutes and regulations. Plaintiffs have worked to reform Wildlife Services' activities throughout the United States, including in Wyoming. Plaintiffs and their members have an interest in preventing Wildlife Services from being involved in lethal wildlife damage management, particularly predator control, and in the use of more effective and proactive nonlethal alternatives that foster communities' coexistence with wildlife.

12. In sum, the interests of Plaintiffs' members have been, and will continue to be, injured by Wildlife Services' wildlife-killing activities in Wyoming and its failure to comply with NEPA in implementing its Predator Damage Management program.

13. The relief Plaintiffs seek in this complaint would redress the injuries of Plaintiffs' members. The relief Plaintiffs request, if granted, would prevent Wildlife Services from engaging in predator damage management activities unless and until it complies with federal law. Plaintiffs' requested relief, if granted, could reduce the amount of lethal predator control and other wildlife killing conducted in Wyoming. The Wyoming Game and Fish Department, Wyoming Department of Agriculture, Wyoming Animal Damage Management Board, local municipalities, and private livestock producers cannot completely replace Wildlife Services' activities authorized through the 1997 EA/FONSI and 1998 EA/FONSI. Those entities do not have the equipment, such as fixed-wing aircraft for aerial gunning operations, or trained wildlife killing personnel that Wildlife Services has.

14. Plaintiffs' interests, and those of their members, have been, are being, and, unless the requested relief is granted, will continue to be harmed by Wildlife Services' actions and

inactions challenged in this complaint. If this Court issues the relief requested, the harm to Plaintiffs' interests, and of the harm to their members' interests, will be redressed.

15. Defendant USDA APHIS WILDLIFE SERVICES is a division of the United States Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS"). Wildlife Services is a federal agency that is responsible for applying and implementing the federal laws and regulations challenged in this complaint. Wildlife Services receives federal and cooperator funding to undertake wildlife damage management activities in Wyoming.

16. Defendant JANET L. BUCKNALL is being sued in her official capacity as the Deputy Administrator of USDA APHIS Wildlife Services.

## LEGAL BACKGROUND

### I. National Environmental Policy Act

17. Under NEPA, a federal agency must prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). The human environment "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

18. "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* § 1500.1(c). The CEQ "regulations provide the direction to achieve this purpose." *Id.* To that end, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert

agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

19. To determine whether an action is significant—i.e., whether an EIS is necessary for the proposed action—an agency may first prepare an Environmental Assessment ("EA"). *Id.* § 1501.4(b). "Significance" determinations are governed by CEQ regulations, which require agencies to consider both the context of the action and the intensity of the environmental impacts. *Id.* § 1508.27. If the agency determines that a full EIS is not necessary, the agency must prepare a finding of no significant impact ("FONSI"). *Id.* § 1501.4(e). A FONSI is a "document . . . briefly presenting the reasons why [the proposed] action . . . will not have a significant effect on the human environment . . . ." *Id.* § 1508.13.

20. The environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16 (environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

21. An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. *Id.* § 1502.9(c)(1)(ii); *see Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1098 (10th Cir. 2004).

## II. Administrative Procedure Act

22. NEPA does not contain an internal standard of review, so judicial review is therefore governed by the APA. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by

7

law." 5 U.S.C. § 706(2)(A), (D).

23. In addition, APA section 706(1) authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL BACKGROUND

### I. Wildlife Services' Wildlife-Killing Program

24. Wildlife Services and its precursors have specialized in killing wildlife for more than 100 years and are responsible for the eradication of wildlife like wolves, bears, and other animals from much of the United States, particularly in the West. Wildlife Services contracts with other federal agencies, non-federal government agencies, and private landowners.

25. At present, Wildlife Services kills more than a million native animals every year in the U.S. In Fiscal Year 2017, Wildlife Services reports that it killed 357 gray wolves; 69,041 adult coyotes, plus an unknown number of coyote pups in 393 destroyed dens; 624,845 red-winged blackbirds; 552 black bears; 319 mountain lions; 1,001 bobcats; 675 river otters, including 587 killed "unintentionally;" 3,827 foxes, plus an unknown number of fox pups in 128 dens; and 23,646 beavers. The program also killed 15,933 prairie dogs outright, as well as an unknown number killed in more than 38,452 burrows that were destroyed or fumigated.

26. Each year Wildlife Services unintentionally kills thousands of nontarget animals. The wildlife-killing program unintentionally killed nearly 3,000 animals in 2017, including wolves, badgers, bears, bobcats, foxes, muskrats, otters, porcupines, raccoons, and turtles. Its killing of nontarget birds included chickadees, bluebirds, cardinals, ducks, eagles, grouse, hawks, herons, swans, and owls. Dozens of domestic animals—including companion animals and livestock—were also killed. These killings undermine efforts to conserve and recover state and federally protected endangered wildlife, which oftentimes need protection in part due to Wildlife

Services' historic and ongoing practices.

27. Former employees have alleged that Wildlife Services underreports the numbers of animals the agency kills, and therefore, the actual numbers of animals killed are likely greater than reported.

28. Many of the species Wildlife Services targets play critical roles in ecosystems, and their removals result in a cascade of unintended consequences. The loss of top predators is well documented to cause a wide range of unanticipated impacts that are often profound, altering processes as diverse as the dynamics of disease, wildfire, carbon sequestration, invasive species, and biogeochemical cycles. In short, the removal of so many animals from the environment—especially predators—significantly alters native ecosystems directly, indirectly, and cumulatively.

29. Many of the methods Wildlife Services uses—including snares; leg-hold and body-gripping traps; and gas cartridges—are fundamentally nonselective, environmentally destructive, inherently cruel, and often ineffective, as explained below.

30. For example, leg-hold traps are internationally recognized as inhumane and have been banned or restricted in many countries and U.S. states. Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limbs. The force of the jaws clamping on the animal's limb and the subsequent struggle result in severe trauma, including mangling of the limb; fractures; damage to muscles and tendons; lacerations; injury to the face and mouth; broken teeth; loss of circulation; frostbite; and amputation. Wildlife Services often fails to routinely check its traps, and thus many animals experience prolonged suffering and sometimes eventually die of exposure.

31. In Wyoming, the 1997 EA/FONSI and 1998 EA/FONSI authorize Wildlife Services' involvement in "Predator Damage Management." Specifically, these documents authorize the use of leg-hold traps, cage traps, snares, ground shooting, hunting dogs, aerial hunting (shooting fleeing animals from airplanes or helicopters), M-44s (sodium cyanide "bombs"), livestock protection collars, gas cartridges (to kill animals in dens), and more.

32. Target species listed in the 1997 EA/FONSI and 1998 EA/FONSI include coyote, red fox, bobcat, badger, black bear, beaver, raccoon, skunks, porcupines, and mountain lions. The 1997 EA/FONSI and 1998 EA/FONSI report that Wildlife Services also unintentionally trapped and sometimes killed several nontarget animals in the mid-1990s in Wyoming, including badgers, bobcats, mule deer, red foxes, rabbits, porcupines, raccoons, skunks, and feral cats and dogs. In 2017, Wildlife Services reports killing 5,645 coyotes, 52 wolves, 237 foxes, 1,023 ravens, 305 rabbits and thousands of other creatures in Wyoming.

33. According to the 1997 EA/FONSI, Wildlife Services' Predator Damage Management program in western Wyoming included 11 western Wyoming counties: Big Horn, Carbon, Fremont, Hot Springs, Lincoln, Park, Sublette, Sweetwater, Teton, Uinta and Washakie counties. And according to the 1998 EA/FONSI, Wildlife Services' Predator Damage Management program in eastern Wyoming included nine eastern Wyoming counties: Albany, Campbell, Crook, Goshen, Johnson, Natrona, Niobrara, Sheridan, and Weston counties. In short, 20 of 23 counties in Wyoming were covered by the 1997 EA/FONSI or 1998 EA/FONSI.

**II.  History of NEPA Analysis of Predator Damage Management in Wyoming**

34. Wildlife Services in 1994 prepared (and in 1997 amended) a Programmatic EIS ("1994 PEIS") to analyze its nationwide wildlife damage control program. That outdated document relies mostly on science from the 1980s, with some studies from as far back as the

1930s. On October 12, 2016, Wildlife Services announced that it intends to redo or revise the NEPA documents currently tiered to the 1994 PEIS.

35. In 1997, Wildlife Services issued an Environmental Assessment and Finding of No Significant Impact for "Predator Damage Management" in western Wyoming. The 1997 EA/FONSI explains that its analysis "relies mainly on existing data contained in published documents and the ADC programmatic EIS (USDA 1994) which is hereby incorporated into this document by reference."

36. In 1998, Wildlife Services issued an Environmental Assessment and Finding of No Significant Impact for "Predator Damage Management" in eastern Wyoming. The 1998 EA/FONSI explains that its analysis "relies primarily on existing data contained in published documents and the ADC programmatic EIS."

37. On November 7, 2016, Wildlife Services released a pre-decisional Environmental Assessment for "Predator Damage and Conflict Management in Wyoming." On December 16, 2017, Plaintiffs submitted written comments on the pre-decisional Environmental Assessment.

38. Nearly a year after Wildlife Services released the pre-decisional Environmental Assessment, on September 1, 2017, the Center for Biological Diversity inquired by email when Wildlife Services would issue its final Environmental Assessment. On September 18, 2017, the Wyoming State Director for Wildlife Services responded by explaining that they "hope to finish the analysis of the public comments and edits in the next few months."

39. As of the date of this complaint, however, Wildlife Services still has not supplemented its analysis in the 1997 EA/FONSI or 1998 EA/FONSI or finalized the 2016 pre-decisional Environmental Assessment. Wildlife Services has never prepared an EIS analyzing the impacts of its Predator Damage Management program in Wyoming and instead continues to

rely on the outdated 1994 PEIS.

### III. New Information and Circumstances Affecting Predator Damage Management in Wyoming

40. Since Wildlife Services prepared its 1997 EA/FONSI and 1998 EA/FONSI, new information and circumstances demonstrate that supplemental NEPA analysis is required.

41. The number of animals Wildlife Services killed in Wyoming has sharply increased. In 1996, Wildlife Services killed a total of 6,293 animals in Wyoming. In 2017, that number was up to a total of 20,604 animals—an increase of more than 325 percent.

42. Ravens were the only birds analyzed in the 1997 EA/FONSI and 1998 EA/FONSI, which explained that Wildlife Services killed, at most, 30 ravens in western Wyoming and none in eastern Wyoming during the 1993-1996 period for its Predator Damage Management program. In contrast, the 2016 pre-decisional Environmental Assessment states that Wildlife Services killed an annual average of 655 common ravens, 574 American crows, and 31 black-billed magpies during the 2010-2014 period for its Predator Damage Management program. These figures demonstrate a dramatic increase in the number of common ravens, American crows, and black-billed magpies Wildlife Services killed in Wyoming in recent years.

43. The annual average number of coyotes Wildlife Services killed in Wyoming also substantially increased. The 1997 EA/FONSI and 1998 EA/FONSI respectively report annual averages of 3,092 coyotes killed in western Wyoming and 2,544 coyotes killed in eastern Wyoming, while the 2016 pre-decisional Environmental Assessment reports Wildlife Services killed an annual average of 7,042 coyotes in the state.

44. Additionally, the number of raccoons Wildlife Services killed has increased considerably. The 1997 EA/FONSI and 1998 EA/FONSI respectively report Wildlife Services killed 71 raccoons in western Wyoming and three raccoons in eastern Wyoming in 1995, while

the 2016 pre-decisional Environmental Assessment reports the agency killed an annual average of 2,177 raccoons in the state.

45. The number of skunks Wildlife Services killed has also increased greatly. The 1997 EA/FONSI and 1998 EA/FONSI respectively report Wildlife Services killed eight skunks in western Wyoming and three skunks in eastern Wyoming in 1995, while the 2016 pre-decisional Environmental Assessment reports the agency killed an annual average of 503 skunks in the state.

46. The number of badgers killed has also increased greatly. The 1997 EA/FONSI and 1998 EA/FONSI respectively report Wildlife Services killed 14 badgers in western Wyoming and four badgers in eastern Wyoming in 1995, while the 2016 pre-decisional Environmental Assessment reports the agency killed an annual average of 65 badgers in the state.

47. Wildlife Services targets different species than it did under the 1997 EA/FONSI and 1998 EA/FONSI. For example, Wildlife Services did not target gray wolves in Wyoming because wolves benefited from protections under the federal Endangered Species Act when Wildlife Services prepared the 1997 EA/FONSI and 1998 EA/FONSI. Wyoming's gray wolves have since lost those federal protections, and Wildlife Services now targets wolves despite the fact that Wildlife Services has not analyzed impacts of its Predator Damage Management program on gray wolves in a final NEPA document. Wildlife Services reports killing just four wolves in Wyoming from 1996 to 1998, but it killed 217 wolves there from 2015 to 2017. In 2017, Wildlife Services killed 52 wolves in Wyoming, out of a total statewide population of 347.

48. The methods Wildlife Services uses have changed since the late 1990s. For example, the 1997 EA/FONSI and 1998 EA/FONSI authorize the use of livestock protection

collars, which Wildlife Services no longer uses in Wyoming.

49. Since Wildlife Services released its 1997 EA/FONSI and 1998 EA/FONSI, additional animals that live in Wyoming were listed as threatened or endangered under the Endangered Species Act, and additional species of special concern also have been identified in the state. These include the Canada lynx (listed as threatened in 2000), North American wolverine (proposed as threatened in 2013), and northern long-eared bat (listed as threatened in 2015). These species may be affected by the Predator Damage Management program, but none were analyzed in the 1997 EA/FONSI or 1998 EA/FONSI.

50. After Wildlife Services released the 1997 EA/FONSI and 1998 EA/FONSI, the Environmental Protection Agency issued new restrictions to protect endangered species that could be harmed by Wildlife Services' use of gas cartridges to kill denning animals.

51. In the last decade, several M-44s that Wildlife Services placed have poisoned people, nontarget wildlife, and family dogs, including two family dogs near Casper in 2017. A supplemental NEPA analysis should analyze the unintended impacts of M-44s and determine whether Wildlife Services should continue to use these dangerous devices in Wyoming.

52. Since the 1997 EA/FONSI and 1998 EA/FONSI, numerous studies have been published that demonstrate the harmful ecological effects of removing predators from ecosystems (e.g., Beschta & Ripple 2009, 2016; Levi et al. 2012; Bergstrom et al. 2013; Bergstrom 2017).

53. Numerous studies published since the 1990s call into question Wildlife Services' assumption that killing predators effectively protects commercial livestock over the long-term. For example, Wielgus and Peebles (2014) found that killing predators to protect livestock can backfire and may increase livestock depredation. In addition, Treves and others (2016) found

14

little or no scientific support for the proposition that killing predators such as wolves, mountain lions, and bears reduces livestock losses.

54. In addition, new information regarding the cost-effectiveness of predator control has emerged since the 1990s. For example, Rashford and Grant (2010) published a literature review of economic analyses of predator control.

55. New information raising ethical concerns about the practices of some Wildlife Services staff has also emerged since the 1990s. For example, in 2012, the Sacramento Bee published a series of articles exposing the practices of Wildlife Services. This series described ethical problems within the agency, including employees hiding killings of nontarget animals. The Sacramento Bee also reported that a Wildlife Services employee based in Wyoming posted photographs online of his dogs attacking coyotes caught in leg-hold traps and was not disciplined.

56. Since the 1997 EA/FONSI and 1998 EA/FONSI, a variety of nonlethal, alternative methods have been successfully used to prevent wildlife conflicts, and numerous studies have demonstrated the effectiveness of such nonlethal methods to protect livestock from predators (e.g., Shivik et al. 2003; Lance et al. 2010).

57. The number of Wyoming counties covered by Wildlife Services' Predator Damage Management program has expanded since the 1990s, when Wildlife Services did not operate in several counties in the state.

58. More than 20 years have passed since preparation of the 1994 PEIS, 1997 EA/FONSI, and 1998 EA/FONSI. For all the reasons explained above, those analyses are now outdated and can no longer be reasonably relied upon without supplemental NEPA analysis. Indeed, Wildlife Services itself acknowledged the necessity of new analysis in 2016 when it

announced it would redo all environmental assessments relying on the outdated 1994 PEIS and undertake a new NEPA process for its Wyoming program.

## CLAIM FOR RELIEF

### NEPA and APA Violation: Failure to Supplement 1997 EA/FONSI and 1998 EA/FONSI

59. Plaintiffs re-allege and incorporate by reference the preceding paragraphs into the claim set forth below.

60. An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii). Here, more than two decades have passed since Wildlife Services completed its 1994 PEIS, 1997 EA/FONSI, and 1998 EA/FONSI. Those analyses are now outdated and can no longer be reasonably relied upon without supplemental analysis.

61. Indeed, significant new circumstances and information emerged that are relevant to environmental concerns and have bearing on APHIS-Wildlife Services' Predator Damage Management program and related impacts in Wyoming. For example, the number of animals Wildlife Services killed for its Predator Damage Management program in Wyoming has sharply increased. Recent studies demonstrate the harmful effects of removing predators from ecosystems, and additional animals have been protected under the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and require analysis.

62. Wildlife Services' failure to supplement its NEPA analysis and its failure to limit or halt its ongoing activities while completing new analyses, as NEPA requires, is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action

unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706. These actions and inactions caused or threaten to cause serious prejudice and injury to Plaintiffs' rights and interests.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

(1)     Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. §§ 4321-4347, and the implementing CEQ regulations, 40 C.F.R. §§ 1500-1508, by failing to supplement its outdated NEPA analyses governing its Predator Damage Management program in Wyoming;

(2)     Declare that Wildlife Services' failure or refusal to supplement its outdated NEPA analyses and its failure to halt or limit its ongoing activities while completing the new analysis is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under section 706 of the APA;

(3)     Order Wildlife Services to complete the required supplemental NEPA analysis by a reasonable date certain;

(4)     Enjoin Wildlife Services and its agents from implementing the challenged Predator Damage Management program unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

(5)     Award Plaintiffs their attorneys' fees and costs in this action pursuant to 28 U.S.C. § 2412; and

(6)     Grant such other and further relief as the Court deems just and proper.

//

//

//

DATED: January 29, 2019

Respectfully submitted,

*Andrea Santarsiere*
Andrea L. Santarsiere
WY Bar No. 7-5396
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
Telephone: (303) 854-7748
asantarsiere@biologicaldiversity.org

Collette L. Adkins
MN Bar No. 035059X*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

*Seeking admission *pro hac vice*

*Attorneys for Plaintiffs*